JUDGE KAPLAN

11 CIV 0348

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Case Nos.　**10-CV-_____**
05-CR-00517-Kaplan

Plaintiff/Respondent,

v.

MANUEL SALAZAR-ESPINOSA,

Defendant/Movant.

RECEIVED
JAN 13 2011
U.S.D.C. S.D.N.Y.
CASHIERS

<u>**MEMORANDUM BRIEF IN SUPPORT OF PETITION TO**</u>
<u>**VACATE SENTENCE FILED PURSUANT TO 28 U.S.C. §2255**</u>

**(Appendix with supporting exhibits filed under separate cover)**

# TABLE OF CONTENTS

*Page*

A.  Statement of facts regarding suppression, structural error, and other Section 2255 issues ..................................................................................................1

1.  Preface....................................................................................................1

2.  Relevant facts occurring in Colombia............................................................2

    a.  The arrest and "confessions" ...............................................................2

    b.  "Plan Colombia" is relevant to finding a "joint venture" .......................2

    c.  The United States specially trained Colombian STI-SIU units were used in this case ................................................................................4

    d.  Salazar's Colombian attorney, though present at the Colombian jail, was not permitted access before or during his client's post-arrest statement of May 26, 2005 .....................................................5

    e.  The Extraterritorial Rights Waiver ......................................................6

    f.  Analysis of the Colombian Prison Log entries for May 26, 2005..........6

3.  Relevant facts occurring in the United States .............................................7

    a.  Defense counsel Herrmann appears and fails to investigate, file motions, or defend..............................................................................7

    b.  One year after his appearance, Herrmann requests leave to withdraw complaining that Salazar will not plead guilty .......................9

    c.  Linda George enters her appearance and the government provides belated discovery concerning Salazar's access to Colombian counsel contemporaneous with his Colombian confessions..................................................................................11

    d.  The suppression motion..................................................................12

    e.  Trial .............................................................................................13

    f.  Salazar's appeal is denied ..............................................................14

Argument.............................................................................................. 14

Petitioner Received Ineffective Assistance of Counsel in Violation of His Sixth Amendment Right and the Evidence is Insufficient to Sustain the Money Laundering Conviction as a Result of the Supreme Court's Substantive Review of 18 U.S.C. § 1956 ....................................................14

i

A.     Standard of review ............................................................................... 14

B.     Counsel had an affirmative obligation under the Sixth Amendment to investigate legal and factual issues. ........................... 15

C.     The Defendant's Sixth Amendment right to effective assistance of counsel through adequate pretrial investigation was violated ............................. 16

POINT I

Defense Counsel Rendered Ineffective Assistance by Failing to: (1) Timely Investigate the Factual Predicate and Setting of the May 2005 Colombia "Confessions;" (2) Timely Request Discovery of the *Res Gestae* of the Post-Arrest Statements Before Expiration of the Discovery Deadline; and (3) Timely Motion the Court to Suppress the Post-Arrest Statements ...................................... 17

A.     Argument ............................................................................................... 17

B.     The Extraterritorial Rights Form is constitutionally defective ............... 19

C.     Extraterritorial post-arrest statements and waivers must meet United States constitutional standards including the right to access counsel ....................................................................................... 21

    1.    Defense counsel erroneously disregarded critical trial evidentiary issues of (1) Salazar's Fifth Amendment right against self-incrimination, (2) whether the Sixth Amendment right to counsel attached and was invoked, and (3) whether Salazar's due process rights were violated ................................. 22

    2.    Defense counsel disregarded Petitioner's right to complain that United States' officials denied Salazar his right to Due Process under the United States Constitution by failing to provide the assistance of counsel ............................................... 23

    3.    Defense counsel disregarded Petitioner's rights under the Self-Incrimination Clause, the Due Process Clause of the Fifth Amendment and the Counsel Clause of the Sixth Amendment by his failure to inquire into United States' involvement in precluding Petitioner's timely access to Colombian counsel which now necessitates hearing on the facts ................................................................................................. 25

    4.    Defense counsel disregarded Petitioner's right to challenge the Colombian and United States officials' participation in Salazar's jailing, withholding access to counsel, and obtaining his confession including the argument that Colombia's participation was so substantial that the action constituted a "joint venture" ............................................................................. 27

    5. The *Bin Laden* line of cases provide appropriate guidance suggesting suppression should have resulted ................................................ 30

POINT II

Under Governing Law, Petitioner is Actually and Factually Innocent of the Count III Money Laundering Charges ................................................................... 33

    A.    Background facts ........................................................................ 33

    B.    There has been a sea change in the law since conviction .................................. 33

    C.    Review of the jury instructions in light of *Santos/ Cueller/ Ness/ Garcia* reflects affirmative misstatements of law, insufficiency of proof, and required additional elements that were not established .................... 36

POINT III

Petitioner Received Ineffective Assistance of Counsel Based on Trial Counsel's Failure to Request Theory of Defense Instructions Concerning "Withdrawal" ................................................................................................... 38

    A.    Factual predicate for jury instruction ................................................. 38

    B.    Petitioner was prejudiced by trial counsel's failure to request the jury instruction ........................................................................ 40

# TABLE OF AUTHORITIES

*Page(s)*

**Supreme Court Case**

*Balzac v. Puerto Rico*,
258 U.S. 298 (1922)..................................................................................26

*Cuellar v. United States*,
128 S. Ct. 1994 (2008)............................................................................33

*Johnson v. Zerbst*,
304 U.S. 458 (1938)................................................................................23

*Kimmelman v. Morrison*,
477 U.S. 365 (1986)..........................................................................14, 15

*Kirby v. Illinois*,
406 U.S. 682 (1972)................................................................................22

*Maine v. Moulton*,
474 U.S. 159 (1985)..........................................................................22, 24

*Massiah v. United States*,
377 U.S. 201 (1964)................................................................................30

*McNeil v. Wisconsin*,
501 U.S. 171 (1991)..........................................................................22, 23

*Michigan v. Harvey*,
494 U.S. 344 (1990)................................................................................23

*Michigan v. Jackson*,
475 U.S. 625 (1986)................................................................................22

*Moran v. Burbine*,
475 U.S. 412 (1986)................................................................................24

*Powell v. Alabama*,
287 U.S. 45 (1932)......................................................................23, 24, 30

*Reid v. Covert*,
354 U.S. 1 (1957)....................................................................................26

*Rompilla v. Beard*,
545 U.S. 374 (2005)................................................................................15

*Schriro v. Summerlin*,
542 U.S. 348 (2004)................................................................................33

                                                                    *Page(s)*

*Strickland v. Washington,*
    466 U.S. 668 (1984) ........................................................ 14, 15, 40

*Teague v. Lane,*
    489 U.S. 288 (1989) ................................................................. 33

*United States v. Santos,*
    128 S. Ct. 2020 (2008) ...................................................... 33, 36

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978) ................................................................ 40

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ........................................................... 24, 27

**Lower Court Case**

*Lindstadt v. Keane,*
    239 F.3d 191 (2d Cir. 2001) ..................................................... 15

*LiPuma v. Comm'r, Dep't of Corrections,*
    560 F.2d 84 (2d Cir.), *cert. denied,* 434 U.S. 861 (1977) .............. 17

*Logarusic v. United States,*
    464 U.S. 840 (1983) ................................................................ 28

*Pavel v. Hollins,*
    261 F.3d 210 (2d Cir.2001) ...................................................... 16

*People v. Barona,*
    56 F.3d 1087 (9th Cir. 1995) .................................................... 29

*Peterson v. United States,*
    812 F.2d 486 (9th Cir. 1987) .................................................... 29

*Pfeifer v. USBOP,*
    615 F.2d 873 (9th Cir.), *cert. denied,* 447 U.S. 1908 (1980) ....... 26, 29

*Stonehill v. United States,*
    405 F.2d 738 (9th Cir. 1968), *cert. denied,* 395 U.S. 960 (1969) ...... 29

*United States v. Adenji,*
    31 F.3d 58 (2d Cir. 1994) ........................................................ 10

*United States v. Aulet,*
    618 F.2d 182 (2d Cir. 1980) ..................................................... 16

*United States v. Bagaric,*
    706 F.2d 42 (2d Cir.), *cert. denied,* 464 U.S. 840 (1983) ........... 28, 31

*United States v. Bin Laden*,
132 F. Supp. 2d 168 (S.D.N.Y. 2001)......................................................................21

*United States v. Borelli*,
336 F.2d 376 (2d Cir. 1964) ......................................................................41

*United States v. Busic*,
592 F.2d 13 (2d Cir. 1978) ......................................................................28

*United States v. Covington*,
783 F.2d 1052 (9th Cir. 1985) ......................................................................27

*United States v. DiTommaso*,
817 F.2d 201 (2d Cir. 1987) ..............................................................17, 31

*United States v. Garcia*,
587 F.3d 509 (2d Cir. 2009) ......................................................................34

*United States v. Hensel*,
509 F. Supp. 1364 (D. Me. 1981) ......................................................................26

*United States v. LaMorte*,
950 F.2d 80 (2d Cir.1991) ......................................................................40

*United States v. Lira*,
515 F.2d 68 (2d Cir. 1975) ......................................................................27

*United States v. Matos*,
905 F.2d 30 (2d Cir. 1990) ......................................................................16

*United States v. Maturo*,
982 F.2d 57 (2d Cir. 1992) ..............................................................27, 28

*United States v. Molina-Chacon*,
627 F. Supp. 1253 (E.D.N.Y. 1986) ..............................................................28, 31

*United States v. Nagelberg*,
434 F.2d 585 (2d Cir.), *cert. denied*, 401 U.S. 939 (1971)......................................26

*United States v. Ness*,
565 F.3d 73 (2d Cir. 2009) ......................................................................34

*United States v. Panebianco*,
543 F.2d 447 (2d Cir.1976) ......................................................................40

*United States v. Paternina-Vergara*,
749 F.2d 993 (2d Cir. 1984), *cert. denied* 469 U.S. 1217 (1985) ......................................28

Page(s)

*United States v. Salameh,*
152 F.3d 88 (2d Cir.1998) ........................................................................ 39

*United States v. Thomas,*
239 F.3d 163 (2d Cir. 2001) ..................................................................... 10

*United States v. Trenary,*
473 F.2d 680 (9th Cir. 1971) ..................................................................... 27

*United States v. Welch,*
455 F.2d 211 (2d Cir. 1972) ....................................................................... 27

*United States v. Yousef,*
327 F.3d 56 (2d Cir. 2003) ................................................................. 12, 21

**Other Authorities**

1 ABA Standards for Criminal Justice 4-4.1, Defense Function (3d ed.1993) ............................ 16

*United States v. Coleman,* 25 M.J. 679, 686 (ACMR 1987) ...................................................... 29

## A. Statement of facts regarding suppression and other Section 2255 issues.

### 1. Preface.

Salazar suffered a Sixth Amendment violation. The lawyer he hired simply was not interested in anything but a quick plea and cooperation agreement. That lawyer failed and refused to investigate facts and legal issues. He failed and refused to file any defensive motions. Notwithstanding the clear instructions of his client and recognition that no decision was made by his client concerning trial or plea past the motion cutoff date, counsel did not perform the work necessary to protect Salazar's right to a fair trial nor did he seek suppression of crucial confessional evidence. To the contrary, in an effort to withdraw from his representation, counsel demeaned his client to this Court and suggested his personal belief in Salazar's guilt by association with former clients. Counsel criticized Petitioner for refusing to accept a plea agreement that would require substantially more than twenty years incarceration. Conviction and the functional equivalent of a life sentence followed.

The result of counsel's malfeasance and misfeasance is described below and includes a constructive "waiver" of Petitioner's right to contest the admission of his "confession" to federal law enforcement authorities in Cali and Bogota, Colombia on May 23 and 26, 2005. Petitioner had a good faith basis upon which to seek suppression, a motion that was repudiated by this Court based upon untimeliness. It is argued that Petitioner suffered constitutional harm in that he received nearly no guidance from an attorney until shortly prior to trial and the substitution of new counsel. Finally, in the interim between conviction and the filing of this motion, the Supreme Court substantively reinterpreted the money laundering statute of conviction under Count III such that Petitioner is *factually innocent*.

This motion seeks to vacate the convictions under Counts I-III, to wit: Count I, charging a violation of 21 U.S.C. § 963, conspiracy to import narcotics into the United States; Count II, charging a violation of 21 U.S.C. §§ 959(a)&(c), 960(a)(3), and 960(b)(1)(B)(ii), distribution of

narcotics with intent to import; and Count III, charging a related violation of 18 U.S.C. § 1956(h), money laundering conspiracy.

## 2. Relevant facts occurring in Colombia.

### a. The arrest and "confessions."

Salazar was arrested on May 23, 2005, in Cali, Colombia by Colombian National Police along with agents of the Drug Enforcement Administration. Salazar was flown from Cali to Bogota the same day of his arrest, accompanied by both Colombian and DEA agents. He was interviewed on May 23 and May 26, 2005. Petitioner appends copies of cables reflecting his post-arrest statements, which also identify Colombian National Police agents who participated along with DEA Special Agents Lowe and Cole in both taking his statements and the arrest. *See* Cable/Report of Post-Arrest Interview of Salazar dated May 23, 2005 Exhibit A ("members of the Bogota STI-SIU arrested Salazar-Espinosa on a Colombian arrest warrant that was issued based on probable cause listed in the United States") (Large portions of cable redacted); Cable/Report of Post-Arrest Interview of Salazar dated May 26, 2005, Exhibit B (debriefing of Salazar in Bogota on May 26, 2005). This symbiotic relationship between Colombian and United States agents is fostered through "Plan Colombia."

### b. "Plan Colombia" is relevant to finding a "joint venture."

Defendant respectfully requests judicial notice of the role of the Departments of State and Justice in "Plan Colombia," a $7.5 Billion government sponsored law enforcement program that includes joint law enforcement and "judicial cooperation." *See* Section 3203 of the Emergency Supplemental Act 2000 as enacted in the Military Construction Appropriations Act, 2001 Public Law 106-246, related to "Plan Colombia," i.e. requiring catalogue of all extraditions, extradition requests, legal impediments from Colombia if any to criminal proceedings in the U.S. This plan suggests a joint venture or agency relationship between U.S. and Colombian agents in the extradition and prosecutorial process.

As a result of "Plan Colombia," the nation of Colombia changed its criminal laws, including the law governing "conspiracy" and its political position concerning extradition of its citizens to the United States. It also opened its jails to ready access to United States agents. However, as described here, defense counsel did not receive the same unfettered access. Colombia also began to engage in joint investigatory and law enforcement operations beyond simple MLAT matters. *See* United States Department of State International Narcotics Control Strategy Report-2005, Released by the Bureau for International Narcotics and Law Enforcement Affairs, March 2005, at 127 ("The number of drug-related extraditions from Colombia to the United States has increased significantly over the years. For example, very early in President Uribe's administration, extraditions increased dramatically with 173 Colombian nationals and 8 non-nationals extradited (total: 181 extraditions) by the end of 2004.").

There is no bilateral mutual legal assistance treaty between the United States and Colombia, but the two countries rely on mutual legal assistance provisions in multi-lateral agreements and conventions, such as the OAS Convention on Mutual Legal Assistance, to effectuate cooperation. *See also* CRS report for Congress, Order Code RL30541: Colombia: Plan Colombia Legislation and Assistance (FY 2000 - FY 2001) [each year thereafter], updated July 5, 2001 *Report on Status of Requested Extraditions* ("No later than 6 months after enactment, i.e., by March 13, 2001, and every six months after that during which Plan Colombia funds are made available, the Secretary of State must submit to foreign affairs and appropriations committees under Section 3202 a report on the status of persons whose extradition has been requested from any country receiving counter narcotics assistance from the United States."). The financial ties of billions of dollars bind the United States and Colombia in a very controlling relationship. Extraditions, arrest operations, jail access to US agents, and special units that work with U.S. DEA agents are the partial result of the payments and Plan. "Plan Colombia" provides U.S. funds to train and equip special Colombian forces to assist in investigations and arrests at the bidding of U.S. agents.

### c. The United States specially trained Colombian STI-SIU units were used in this case.

Over the course of at least the last ten years, the Drug Enforcement Administration (DEA) has caused the creation of what are referred to as "Special Investigations Units" (SIU) of the Colombian National Police (CNP). These units are composed of CNP officers, who are specifically assigned to work with DEA agents in Colombia. There are many such units designated to work with the DEA.

The CNP officers undergo a "vetting" process before they are assigned to the SIU, which includes a criminal, personal and financial background check, polygraph examination, as well covert surveillance. The SIU officers are sent for additional training at the DEA's training facility in Quantico, Virginia and are assigned to work directly with DEA agents assigned to the Bogota and Cartagena country offices. More importantly, individual SIU officers receive an additional salary payment from the United States and are provided with extra equipment, such as cellular phones, computers, and the like.

The SIU units themselves also receive direct benefits from the United States, including access to high technology interception devices for purposes of conducting wiretaps. Upon information and belief, the United States also assists the SIU officers in obtaining office space from which to conduct the wiretaps, vehicles for surveillance, video and audio equipment, and other similar devices. The STI-SIU agents often act as agents of the DEA.

The DEA cable of May 26, 2005, describing the Colombian interview of Salazar of that same date states in pertinent part:

> 3. The Bogota STI-SIU developed intelligence information which indicated that Salazar-Espinosa was traveling to Cali, Colombia...at approximately at 5:30 p.m. on May 23, 2005 Salazar...arrived at the Cali airport...members of the Bogota STI-SIU arrested Salazar-Espinosa on a Colombian arrest warrant that was issued based on probable cause listed in the United States provisional arrest warrant...[Ed. Note: Cable references DEA TWX 5/24/2005].

> 4. On May 24, 2005, Salazar...was transferred to the Colombian Fiscalia in Bogota, Colombia. Salazar-Espinosa was placed in a temporary holding facility

at the Fiscalia office while awaiting transfer to a local prison. [Ed. Note: Fiscalia is the equivalent of "Prosecutor's Office"].

5. BRD SA's Warren Lowe and Terry Cole along with IRS Kelly Robinson went to the Colombian Fiscalia office on May 26, 2005 to further debrief Salazar-Espinosa reference his drug trafficking and money laundering activities...

### d. Salazar's Colombian attorney, though present at the Colombian jail, was not permitted access before or during his client's post-arrest statement of May 26, 2005.

According to the cable reports, Salazar was transferred from Cali to the Colombian "Fiscalia" headquarters in Bogota, Colombia...placed in a temporary holding facility of the Fiscalia's office while awaiting transfer to a local prison." Exhibit B, Report of Post-Arrest Interview of Salazar dated May 26, 2005, ¶ 4. According to that Report, at ¶ 5, SA Lowe advised Salazar under his *Notificación Extraterritorial de Derechos*" (limited *Miranda* rights) and Salazar-Espinosa was provided a copy of these rights to read. *Id.* at ¶ 5.

However, at the same time, the agents asked Salazar to waive his Fifth and Sixth Amendment rights on May 26, 2005, Salazar's attorney, Diego Javier Espitia Plaza, was cooling his heels at the Fiscalia's office and was refused entrance to meet with his client. *See* Affidavit of Diego Javier Espitia Plaza, Exhibit C. Petitioner appends a copy of an informative letter from the Colombian prosecutor's office dated December 22, 2008 which appends an internal prison ledger entitled Prison Log at the Bunker de la Fiscalia Nivel Central, 5/26/2005, Exhibit D (hereinafter "Prison Log"). In pertinent part, that document logs and describes the times of constitutionally relevant events that occurred on May 26, 2005 at that Colombian jail.

As evidenced by his Affidavit, Exhibit C, defense counsel Espitia sought to enter the Colombian jail at 8:00 a.m. on May 26, 2005. As evidenced by the Prison Log, Espitia was not permitted to visit with his client until 3 p.m. that day. *See* Exhibit D. No notification was provided to Salazar that his attorney was outside. Had the attorney been permitted entrance, he would have advised Salazar to discontinue any interview until American counsel could be secured. *See* Exhibit C.

**e. The Extraterritorial Rights Waiver.**

Petitioner appends the signed Notification of Extraterritorial Rights form ("*Notificación Extraterritorial de Derechos*") of May 23, 2005 as Exhibit E and the signed and initialed Notification of Extraterritorial Rights dated May 26, 2005 as Exhibit F. The document provides: "Sin embargo, porque usted no está bajo nuestra custodia y no estamos en los Estados Unidos, no podemos asegurar que se le permita acceso a un abogado... antes de o durante nuestra entrevista." *See* "*Notificación Extraterritorial de Derechos*" at ¶ 6. The above paragraph is translated as follows:

> However, because you are not under our custody and we are not in the United States, *we cannot ensure that you will be permitted access to counsel* ... before or during our interview.

*Notification of Extraterritorial Rights* at ¶6 (emphasis added).

**f. Analysis of the Colombian Prison Log entries for May 26, 2005.**

Petitioner obtained a copy of the Prison Log containing the internal entries of consequence during May 26, 2005, the same day he was again interviewed by two or three federal law enforcement agents in Bogotá, Colombia, which upon best information and belief, occurred within the "Bunker" jail of the Colombian prosecutor. *See* Request & Response Letters along with Excerpt of Prison Log at the Bunker de la Fiscalia Nivel Central, 5/26/2005, Exhibit D.

The first relevant log entry reflects a visit at "0950" (9:50 am) memorializing the admission ("ingreso") of three (3) staff members of the United States Embassy and two (2) others from [Colombian] drug enforcement ("fiscalia de estupefacientes") to conduct an interview ("una entrevista") of the detainees MANUEL SALAZAR and FERNANDO PENA. Visitors include Douglas Lowe, Terrance Cole, who both testified at Salazar's trial, Kelly Robinson, Jairo Rodriguez Becerra, and "judicial investigator" Mauricio Nieto Rojas along with "installation coordinator" Adriana Maria Arango Gallego. All of the law enforcement officials (both U.S. and Colombian) are identified by their badge identification numbers. *See* Exhibit D, Prison Log at pp. 332-333. Also, the name of the three (3) separate individuals who authorized

the visit to Salazar are listed. *Id.* at p. 332. There is **no** corresponding entry showing the agents' departure ("salida"), and their "0950" entry is entered into the log out of chronological order. *Id.*

The second relevant log entry reflects a visit at 15:17 (3:17 pm) memorializing the admission ("ingreso) of the attorney ("abogado") Diego Javier E. Plaza to interview ("a entrevistarse") MANUEL SALAZAR with his respective authorization ("con su respectiva autorizacion"). The next relevant log entry reflects attorney Espitia Plaza's departure ("salida") at 15:45 (3:45 p.m.) after concluding his interview ("por terminar la entrevista") with MANUEL SALAZAR. *Id.* at pp. 334-335.

An entry referring in part to SALAZAR reflects apparent delivery ("entrega") of personal items at 19:00 (7:00 pm) and to other detainees. *Id.* at p.335. The final entry related to SALAZAR reflects his exit ("salida") at 19:05 (7:05 p.m.) to make an outgoing telephone call to "954-343-0019." *Id.* at p.336.

### 3. <u>Relevant facts occurring in the United States.</u>

#### a. <u>Defense counsel Herrmann appears and fails to investigate, file motions, or defend.</u>

In April of 2006, Lawrence Herrmann, Esq. formally entered his appearance on behalf of the Defendant. Approximately 4 months later, in August of 2006, the Defendant was extradited to the United States and charged in a three-count third superseding indictment describing importation and distribution of narcotics, as well as money laundering.

The Defendant's first appearance before the Court occurred in August of 2006. The following month, this Court conducted a Status Hearing ordering that discovery be provided by October 12, 2006 and that defensive motions were due no later than November 1, 2006. However, three weeks after the motion cutoff date, no defensive pleadings were filed and no request for extension of time was presented to the Court.

On November 21, 2006, the parties appeared for a hearing. At that hearing, defense counsel states: "I don't think Mr. Salazar is going to trial. ***But if he does --- I have to assume***

*he does until the day that he signs a plea agreement or accepts a* <u>*Pimentel*</u> *letter and changes his plea. But I still have to prepare for that eventuality.*" *United States v. Salazar-Espinosa*, Status Conference, November 21, 2006, at p. 7. (emphasis added).

On January 8, 2007, the Defendant wrote a letter to his trial counsel requesting that trial counsel seek suppression of all evidence and that Mr. Herrmann obtain and provide the Defendant with all documents. *See* Letter of January 8, 2007 from Petitioner to Lawrence Herrmann, Esq., Exhibit G.

On January 16, 2007, defense counsel moved to continue trial. The request was predicated, at least in part, on defense counsel's need to review "trial-ready transcripts of recordings..." and "to review the case in depth with my client and consider the plea offer I have now received...." *See* Exhibit H, Letter dated January 10, 2007 from Lawrence Herrmann, Esq. to District Judge Kaplan. Moreover, defense counsel described personal problems resulting from very serious health problems afflicting his wife. *Id.*

On February 1, 2007, as a result of plea negotiations by and between defense counsel and the government, Petitioner was presented with a *Pimentel* letter describing a guideline sentencing range of 262 to 327 months. The Court reset trial for April 23, 2007.

Approximately two weeks later, February 15, 2007, Salazar sent his defense counsel a letter, Exhibit I, requesting that a somewhat related Miami indictment be transferred to the S.D.N.Y. under Rule 20 and that all extradition documents and discovery be provided to him for his review before the next court hearing. The Defendant sent defense counsel another letter the following day, Exhibit J, addressing his intention to contest related forfeiture proceedings.

Approximately three weeks later, March 12, 2007, Petitioner again wrote to trial counsel Herrmann asking that a suppression motion be filed as to all intercepted conversations, claiming violation of United States and Mexican law and "requesting you file suppression motion to stop the government from using...evidence against me...." *See* Exhibit K. Still, no application was filed before the Court to extend the time period to file defensive motions. The Petitioner knows

of no investigation undertaken by Herrmann.

Approximately two weeks later, codefendant Ardilla-Rojas entered a guilty plea. Around that same time period, March 30, 2007, Salazar's defense counsel authored a letter to the Court requesting an additional adjournment while also stating that he was not prepared for trial. DE 32. More specifically, defense counsel complains his client did not want to plead guilty. In his letter to the Court, defense counsel questions his client's decision-making stating: "[it] has been difficult for him to absorb, given his age in the mid-50s. He canceled the court date for change of plea... that he has also drafted or requested motions I have been unwilling to file as counsel I have visited him repeatedly, but he still has not decided what course of action to take, to go to trial or seek a more favorable disposition through new counsel." In his letter motion to the district court filed on April 2, 2007, DE 32, Herrmann anticipated it was "highly likely" that Salazar would seek to change counsel and sought a two-week continuance to allow new counsel to prepare for trial. Herrmann revealed that Salazar had *"drafted or requested motions [Herrmann had] been unwilling to file as counsel."* *See* Exhibit L, DE 32 at ¶ 2 (emphasis added); *see also* Exhibit M, Affidavit of Salazar at ¶ 10 (Salazar requested that Herrmann file a timely motion to suppress statements made to agents in May 2005, shortly after his arrest in Colombia awaiting extradition to the United States). The government filed its proposed jury instructions a few days later.

### b. **One year after his appearance, Herrmann requests leave to withdraw complaining that Salazar will not plead guilty.**

On April 11, 2007, defense counsel Herrmann filed a motion to withdraw. DE 38. In that application, defense counsel states, somewhat in contradiction to his "trial is possible" statement at the November 21, 2006 status conference, that: (1) he expected his client would plead guilty, (2) that in fact, his client was not prepared to do so, and (3) that his client was upset because defense counsel refused to file certain defensive motions, in part, because the time for doing so had expired. Last but not least, defense counsel complained that Petitioner's family refused to

make any additional payments because of their belief that defense counsel "has done nothing."

Pretrial and status conference was conducted on April 13, 2007. At that hearing, substitute counsel Linda George, Esq. appeared and engaged in a colloquy with the Court concerning her contingent appearance, depending upon the Court's inclination to grant another brief continuance. Predicated upon a favorable resolution of that issue, Linda George announced she would enter an appearance. After the Court granted another brief continuance, Linda George, Esq. replaced Lawrence Herrmann. George was advised by the Court to be prepared to try the case on May 21, 2007. Upon best information, Herrmann conveyed part or all of his file. *See* Letter from Linda George, Esq. to AUSA, 4/20/2007 (Exhibit N-1) ("The file provided to me did not include a copy of the Extraterritorial Rights Notification Form....").

Notwithstanding repeated requests from Salazar asking counsel to file motions to suppress any inculpatory evidence against him, including the incriminating statements Salazar had made to law enforcement agents who interrogated him while he was incarcerated in Colombia pending extradition, defense counsel Lawrence M. Herrmann ("Herrmann") did not do so. Herrmann was admittedly "*unwilling*" to file the "*requested motions*." Indeed, Herrmann filed no defense motions and even failed to press a request for timely government discovery of the Defendant's post-arrest statements.[1]

---

[1] The prosecution provided a two page summary of the Defendant's statement in October 2006. The prosecution provided the more detailed post-arrest statements on April 11, 2007 (by providing a copy of a DEA cable dated 05/24/05). On May 17, 2007 the prosecution provided the DEA cable dated 05/26/05 purportedly memorializing the confession. It did so months after the discovery deadline and almost two years after the statements were obtained. Trial counsel did not seek prospective sanctions available under Fed. R. Crim. P. 16, Part III(g) for discovery violations. See *United States v. Thomas*, 239 F.3d 163, 168 (2d Cir. 2001) (reversing conviction for late disclosure of Defendant's testimony at administrative proceeding). There can be no doubt that Rule 16 requires the government to disclose the substance of statements made "in response to interrogation by a person the defendant knew was a government agent." See *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994).

### c. Linda George enters her appearance and the government provides belated discovery concerning Salazar's access to Colombian counsel contemporaneous with his Colombian confessions.

Linda George ("George") entered her appearance on April 12, 2007 and replaced Herrmann. Approximately two months later, in a letter dated June 7, 2007, the government advised defense counsel *for the first time* that Salazar received "visits" from defense counsel Espitia in Bogotá, Colombia.

Specifically, the letter advises the defense that "[t]he DEA was informed by a Colombian official this week that on May 25, 2005 and May 26, 2005, the defendant was visited in Bogotá by one Diego Javier Espitia Plaza, who claimed to be an attorney. The Colombian official and DEA confirmed that no U.S. authorities had been informed of this visit prior to this week." *See* Exhibit O, Letter dated June 7, 2007, from U.S. Attorney Garcia to Linda George, Esq. [2] Defense counsel did not request that the government provide the documentary support received for this bare advisement. [3]

Newly retained counsel filed and the trial court substantively ruled on other defense motions, DE 44, Motion to Preclude the Admission of Evidence of Other Crimes; DE 45, Motion to Strike the Charge of Aiding and Abetting, etc.; DE 47, Motion to Preclude Expert Testimony; DE 48, Motion to Compel Confirmation of Informant and Cooperators' Identity, etc. (citations omitted). George did not seek an enlargement of time to do so. Nor did George seek a specific enlargement of time to file a pretrial suppression motion despite the fact that the government's letter of June 7, 2007 was sent *only days before the jury trial.*

---

[2] Colombian counsel tried to obtain access to Salazar before the second interrogation took place, but he was denied access until later that day, after the "confession." *See* Affidavit of Salazar; *accord* Affidavit of Dr. Diego Javier Espitia-Plaza (counsel was denied access to Salazar at 8:00 a.m. on May 26, 2005).

[3] Presumably, the government received documentary support by way of a prison log sign in book or some other alternative form of verification concerning this visit. The government's letter may be interpreted to describe an effort to visit or an actual visit.

### d. **The suppression motion.**

Salazar incorporates by reference DE 84, Exhibit N, entitled Defendant's Motion to Preclude Admission of Defendant's Post-Arrest Statements" along with its supporting exhibits – Government counsel's Letter of June 7, 2007 (Exhibit O) (*citing United States v. Yousef*, 327 F.3d 56, 141 (2d Cir. 2003)) and Affidavit of Salazar (Exhibit M)). On June 11, 2007, after the jury panel had been selected, George filed an untimely motion to suppress Salazar's post-arrest statements based on the contention that Salazar requested the right to counsel before he made the incriminating statements. Among other points, counsel asserts that on May 26, 2005, *for the first time*, interrogators asked Salazar to acknowledge rights described on the right-hand margin of the Notification of Extraterritorial Rights form. The untimely motion asserts that prior to the second interrogation conducted on May 26, 2005, Salazar executed a document known locally as a "*poder*" (Spanish for a "power") thereby formally requesting the assistance of his attorney. Salazar properly claimed the existence of that document proves he requested the right to be represented by his counsel and that the "*poder*" provided more than mere authorization to his Colombian counsel to represent him. It served as the formal invocation of the right to counsel. *See United States v. Salazar*, June 11, 2007, TR. 12-14.

The suppression motion filed by George claims the emerging facts required additional investigation (never conducted by former counsel Herrmann), tacitly admitting (beyond the government's belated disclosure) insufficient evidentiary grounds concerning the constitutional violation. The motion represents that defense counsel was in the process of obtaining a copy of the "*poder*" executed by Salazar. Defense counsel also argued that only after her receipt of the June 7, 2007 disclosure did there exist a colorable Sixth Amendment claim, with objective factual corroboration to seek suppression, beyond her client's word. Herrmann did not timely

obtain a supporting affidavit from Colombian counsel despite earlier requests from Salazar. [4] George did not file such an affidavit.

According to the government's responsive argument the belated June 7, 2007 disclosure letter had no legal impact This Court will draw its own conclusion on why the government made that advisement formally describing an effort to obtain legal counsel contemporaneous with the "confession" if it had no legal impact. The government, after untimely noticing defense counsel of these facts years late, also argued that Defendant should not be permitted to submit an untimely motion to suppress. *See United States v. Salazar-Espinosa*, June 11, 2007 TR 12-13. Defense counsel explained that, as a result of the government's June 7, 2007 disclosure, she had been able to speak with Colombian defense counsel who confirmed he had attempted to visit Salazar in May of 2005. *See Id.*, TR at 14.

The trial court criticized the suppression motion, noting a "Colombian person who claim[ed] to be a lawyer [had] submitted no affidavit... and if the process was followed in this case, it would have gone at some point in time unknown to DEA." *See Id.*, TR at 14. The district court found Salazar knew or should have known he had told agents "I want an attorney" before he made any statements. The trial court concluded that it had no basis for relieving Salazar of the failure to make a timely motion to suppress and denied the relief requested. TR at 15-16. Thus, the district court rejected the defense motion as "untimely." *Id.*

### e. **Trial.**

At trial, the prosecution used Salazar's two post-arrest statements with devastating efficiency in their opening statement, through the direct examination of DEA Agents Cole and

---

[4] Had prior counsel investigated Salazar's claims, he would have learned that Dr. Diego Javier Espitia Plaza was denied access to Salazar for approximately seven hours, when he attempted to enter the underground "Bunker" jail shortly before the second interrogation of May 26, 2005 initiated by U.S. agents with the help of the Colombian jailers and law enforcement. *See* Affidavit of Dr. Diego Javier Espitia-Plaza. Upon best information and belief, Herrmann made no investigative effort to contact Colombian counsel from 2005-2007. He never sought to obtain his client's post-arrest statements although serving as counsel for more than one year.

Lowe, and as the closing argument "highlight reel." During deliberation, the jury even requested copies of Salazar's "confession." TR at 532-33.

### f. Salazar's appeal is denied.

Likewise on appeal, the government very effectively utilized the same evidence used at trial to overcome the Defendant's claim of insufficient evidence to sustain the conviction. On appeal, Salazar challenged the denial of his motion to suppress. Salazar incorporates by reference that portion of his Opening Brief (pp.15-24) challenging: (1) the finding of untimeliness; (2) the court's failure to conduct a hearing; and (3) the substantive denial of the requested suppression. The appellate court upheld the trial court's ruling. This petition follows.

### ARGUMENT

### Petitioner Received Ineffective Assistance of Counsel in Violation of His Sixth Amendment Right and the Evidence is Insufficient to Sustain the Money Laundering Conviction as a Result of the Supreme Court's Substantive Review of 18 U.S.C. § 1956.

### A. Standard of review.

A defendant asserting a post-conviction claim that he was denied effective assistance of counsel must meet both prongs of the standard set by *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant must be able to (1) demonstrate that his trial attorney's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms," *Strickland*, 466 U.S. at 688, and (2) "affirmatively prove prejudice" arising from counsel's allegedly deficient representation. *Id*. at 693. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *Id*. at 694.

Failure to file a suppression motion can amount to ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). The defendant bears the burden of proving "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate

actual prejudice." *Id*. at 375. This duty requires defense counsel either "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also generally Lindstadt v. Keane*, 239 F.3d 191, 200 (2d Cir. 2001).

**B.    Counsel had an affirmative obligation under the Sixth Amendment to investigate legal and factual issues.**

The duty to investigate is essential to the adversarial testing process "because the testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).

The Supreme Court frequently cites the ABA Standards in decisions that evaluate the constitutional reasonableness of a defense counsel's investigations.   See *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (*quoting* ABA Standards for Criminal Justice 4-4.1, Defense Function (3d ed. 1993) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case .... The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.")); *Strickland*, 466 U.S. at 688 ("American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable"); *accord* 1-1a NY Criminal Practice § 1a.4[3] ("[i]f there are witnesses but the defendant does not know their names or whereabouts an investigator should be hired to locate them, interview them ... at least to get a written statement from them as to what they witnessed"). Of particular relevance in this case are the applicable professional standards relevant to the "defense function" which exhort defense counsel to conduct a prompt investigation of the circumstances of the case.

**C.** **The Defendant's Sixth Amendment right to effective assistance of counsel through adequate pretrial investigation was violated.**

The record supports the firm belief that, by the cutoff date for filing defense motions, Salazar was undecided about a plea or trial defense. Herrmann was uncertain if his client would exercise his right to trial. *United States v. Salazar,* Status Hearing, 11/21/2006, at p.7.

Herrmann shirked his responsibilities as defense counsel by failing to procure a sworn affidavit from Colombian counsel to support a timely motion to suppress based on Salazar's claims he had been denied access to counsel prior to signing the waiver of extraterritorial rights. The duty to investigate exists regardless of *"the accused's stated desire to plead guilty."* 1 ABA Standards for Criminal Justice 4-4.1, Defense Function (3d ed.1993) (emphasis added). "[A]lthough failure to make a suppression motion is not *per se* ineffective representation, *Kimmelman,* 477 U.S. at 384, where trial counsel fails to make a motion to suppress because he neglected to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, then ineffective representation is shown." *United States v. Matos,* 905 F.2d 30, 33 (2d Cir. 1990) (remanding for an evidentiary hearing) (citations and internal quotations omitted). Herrmann simply failed to conduct any investigation.

As the trial date approached, Herrmann wrote that he was *"unwilling"* to file *"requested motions."* *See* Letter Motion to the District Court filed on April 2, 2007, DE 32, Exhibit L. His ineffective representation is shown by his words and inaction. *Cf. Pavel v. Hollins,* 261 F.3d 210, 218 & n.11 (2d Cir.2001) (court refused to defer to an attorney's decision not to call a witness as strategic where the decision was "animated primarily by a desire to save himself labor" and therefore "was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefiting his client that the federal courts have denominated strategic and have been especially reluctant to disturb") (internal quotations omitted). "However, defense counsel is not required automatically to file a suppression motion in every case involving a post-arrest statement. *See United States v. Aulet,* 618 F.2d 182, 187 (2d Cir. 1980). It is sufficient

that counsel exercised 'professional discretion in deciding whether there are sufficient grounds' to file a motion. *LiPuma v. Comm'r, Dep't of Corrections,* 560 F.2d 84, 93 (2d Cir.), *cert. denied,* 434 U.S. 861 (1977)." *United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir. 1987). Herrmann failed to exercise professional judgment because he conducted no investigation at all. It cannot be said that Herman exercised any professional discretion under these circumstances. In violation of this Petitioner's constitutional rights, he also hamstrung new counsel who entered her appearance after the motion cutoff date and on the precipice of trial.

Herrmann was simply unwilling to make any effort to investigate and locate Colombian counsel, notwithstanding that he regularly traveled to Colombia to develop new business. George made a belated attempt to locate Colombian counsel. However, by that time, the motion deadline had long passed.

**POINT I:** **Defense Counsel Rendered Ineffective Assistance by Failing to: (1) Timely Investigate the Factual Predicate and Setting of the May 2005 Colombia "Confessions"; (2) Timely Request Discovery of the *Res Gestae* of the Post-Arrest Statements Before Expiration of the Discovery Deadline; and (3) Timely Motion the Court to Suppress the Post-Arrest Statements.**

**A.** **Argument.**

Defense counsel rendered ineffective assistance for failure to conduct a timely investigation and timely file a motion to suppress inculpatory statements made in Colombia. Had counsel done so, suppression would have resulted.

Under the governing law at the time the statement was provided, there exists a good and just reason for suppression of the confession, at least as it pertains to the May 26, 2005 statement. The May 26, 2005 statement was effectively utilized by the prosecution to obtain a conviction. An effort to exclude that statement should have been timely mounted.

The evidence shows the U.S. agents who extracted statements from Salazar shortly after he was arrested in Colombia on May 23, 2005, participated in a joint venture or agency with Colombian law enforcement and jailers. The United States agents, as argued here, failed to obtain a voluntary relinquishment of Fifth and Sixth Amendment rights, given that Salazar

was held *incommunicado* and was presented with a constitutionally defective waiver form after his arrest. Implicitly recognizing the defect in his first waiver, the agents apparently attempted to salvage the error by having him initial each of his separate rights on May 26, 2005. *See* Exhibits E & F, *Notification of Extraterritorial Rights* (identical form with dated initials). However, the latter waiver is also defective because (1) agency partners were contemporaneously denying Salazar's counsel access to his client and (2) the waiver excluded the opportunity to timely meet with counsel. Knowing that Salazar might want to go to trial, as announced at Status Hearing, 11/21/2006 TR, a suppression motion should have been timely filed. The Colombian authorities were on actual notice and the United States authorities were on constructive or actual notice that Salazar signed a "*poder*," a "power" requesting the presence of counsel. He did so before the agents' interview of May 26, 2005.

Herrmann allowed the pretrial motions deadline to expire without ever filing a pleading or undertaking the constitutionally required investigation. *See* Letter Motion to the District Court filed on April 2, 2007, DE 32, Exhibit L at ¶ 2 (Herrmann was "*unwilling*" to file "*requested motions*") (emphasis added).

Counsel rendered ineffective assistance by failing to (1) timely investigate; (2) timely procure affidavit(s) from Colombian counsel concerning the relevant facts, including Colombian counsel's attempt to visit Salazar on May 26, 2005; (3) timely motion the court to extend the pretrial motions deadline; and (4) timely move for suppression. Trial counsel Herrmann's abdication of his professional responsibility to prepare for trial and to preserve his client's right to file pretrial motions to exclude any and all incriminating evidence amounts to a Sixth Amendment violation.

The Sixth Amendment violation is highlighted by the government's belated corroboration of Salazar's pre-existing attorney-client relationship in Colombia. That corroboration may be viewed through the prism of the complete lack of counsel's pretrial investigation and the government's letter of June 7, 2007. The Petitioner, a Colombian national with no experience in

United States law, should not be required to be the sole arbiter to base a suppression motion. Rather, defense trial counsel had an affirmative obligation to investigate, timely move for an extension in which to file, if necessary, particularly after the belated prosecution June 7, 2007 letter noting that an unidentified "Colombian official" only informed DEA *days before trial* that Salazar received visits from counsel more than two years earlier and that "no U.S. authorities had been informed ...of th[e] visit[s] prior to th[e] week [of trial]." That letter mandated a particularized defense discovery request for all evidence surrounding the belated disclosure that would shed additional light on the circumstances surrounding the purported confessions.

**B.    The Extraterritorial Rights Form is constitutionally defective.**

The Notification of Extraterritorial Rights form signed by Salazar ("*Notificación Extraterritorial de Derechos*") contains unconstitutional qualifying language limiting the application of the Fifth and Sixth Amendment. Under the particular facts of this case, given (1) the participation of the United States directed Colombian STI-SIU group, (2) "Plan Colombia," and (3) the symbiotic relationship by and between the Colombian "Fiscalia" (Prosecutor) and United States agents working together in extradition cases, that "qualifying language" precludes the admission of Salazar's May 23 and 26, 2005 statements, assuming a suppression motion was timely filed and factually supported. *See "Notificación Extraterritorial de Derechos"* at ¶ 6 ("Sin embargo, porque usted no está bajo nuestra custodia y no estamos en los Estados Unidos, no podemos asegurar que se le permita acceso a un abogado... antes de o durante nuestra entrevista."). The above paragraph is translated as follows:

> However, because you are not under our custody and we are not in the United States, *we cannot ensure that you will be permitted access to counsel* ... before or during our interview.

*Notification of Extraterritorial Rights* at ¶ 6 (emphasis added). As a practical matter, where U.S. agents coordinate efforts with their foreign counterparts, the offending language prospectively permits United States agents to deliberately deny access to counsel through their agency

partners abroad. The remedy of suppression would serve the judicial interest in deterring similar future conduct.

The qualifying language presents an invitation to provide lip service to the Fifth and Sixth Amendment but, on the other hand, preclude application of the guiding hand of counsel while using the Colombian agents or jailers as a shield to a suppression motion. This is what happened to Salazar while his Colombian jailers provided prompt entry to the DEA agents on May 26, 2005, but disallowed him to meet with his counsel for a period of seven hours. They only authorized Colombian counsel's legal visit after the DEA agents had already obtained Petitioner's statements.

The qualifying language that notes United States agents cannot determine whether the criminal defendant will be permitted to meet with counsel repudiates the basic tenets of both the Fifth and Sixth Amendments. The record demonstrates that the foreign partners obstructed access to counsel. [5] This is particularly the situation where the relationship between the foreign government and our agents transcends traditional cooperation and rises to the level of agency because foreign partners cede primary control of the overseas investigation to their U.S. counterparts.

Under these circumstances, there must be symmetry by providing timely prison access to defense counsel. Under the facts of this case, the emphasized language should not pass constitutional muster because it invites abuse of the criminal defendant's right to have access to counsel before or during joint United States/Colombian or United States interrogations.

---

[5] *See* Exhibit M, Affidavit of Salazar (American and Colombian agents including local jailers were present during the interrogations held in May 2005); Exhibit C, Affidavit of Dr. Diego Javier Espitia-Plaza (counsel was denied access to his client at 8:00 a.m. on May 26, 2005).

**C.** **Extraterritorial post-arrest statements and waivers must meet United States constitutional standards, including the right to access counsel.**

Suppression is an appropriate remedy in light of the fact that the U.S. federal agents operating this case in Colombia failed to obtain a valid extraterritorial waiver of rights while their Colombian partners denied Salazar access to counsel prior to interrogation.

Given the extraordinary history of this District and Circuit in the investigation of terrorists and extraterritorial arrests leading to prosecutions in federal court, a substantial body of law has developed since 2001 concerning the manner in which a United States criminal defendant must be advised in a foreign land of his constitutionally protected Fifth Amendment rights. *United States v. Bin Laden*, 132 F. Supp. 2d 168, 185-192 (S.D.N.Y. 2001); *United States v. Yousef*, 327 F.3d 56, 141 (2d Cir. 2003) (citations omitted).

Given that any post-arrest statements obtained during interrogations conducted by U.S. agents operating overseas must meet the warning/waiver framework of *Miranda* before the statements can be admitted at a jury trial, the obstruction of access to Defendant's counsel necessarily results in the prospective suppression of all extracted statements. Thus, there is ineffectiveness of counsel in failing to timely file a motion to suppress. The post-arrest statements were devastating inculpatory trial evidence. Indeed, the statements were clearly viewed as confessional by the trial jury. *See* TR at 532-533 (deliberating jurors making request to review "any copies of confession to Cole/Lowe on file"). The government cannot discount the prejudice caused by defense counsel's inexcusable failure to timely move for suppression which Petitioner was entitled to as a matter of law.

Defense counsel clearly neglected the duty to thoroughly investigate the facts and research the law applicable to waivers of extraterritorial rights with an eye toward submitting a timely motion to suppress post-arrest statements.

**1. Defense counsel erroneously disregarded critical trial evidentiary issues of (1) Salazar's Fifth Amendment right against self-incrimination, (2) whether the Sixth Amendment right to counsel attached and was invoked, and (3) whether Salazar's due process rights were violated.**

Salazar's Fifth Amendment right against self-incrimination, right to due process of law, and Sixth Amendment right to counsel attached as a result of his Southern District of New York indictment and Colombian counsel's appearance and request to meet with his client during the DEA and Colombian sponsored interrogation at the jail of the Bogota, Colombia "Fiscalia" on May 26, 2005. An individual defendant in a United States' custodial interrogation setting has a Fifth Amendment right to prevent self-incrimination. By Colombian counsel's appearance at the jail the morning of May 26, Petitioner's prior signing of a *"poder"* ("power") to meet with him, an appearance and request for counsel that preceded the DEA agents' entry to that same jail, both Sixth and Fifth Amendment rights applied. The Extraterritorial Rights Form, which excluded advisory of a plenary opportunity to meet with counsel, violates the traditional *Miranda* warnings.

The Sixth Amendment right to counsel attached. Here, it should have been but was never argued that Salazar *invoked the right* by signing the *"poder"* for attorney Espitia before the May 26, 2005 waiver was signed. The right to counsel may not be waived during police-initiated interrogation unless the waiver is made in the presence of the accused's lawyer. See *McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991); *Michigan v. Jackson,* 475 U.S. 625, 635-36 (1986); *Maine v. Moulton,* 474 U.S. 159 (1985). The lawyer cannot be excluded to prevent advisement of rights. Here, Salazar's Sixth Amendment guarantee of the assistance of counsel vested upon indictment by the United States and the signing of the *"poder."* Consequently, any claims that Salazar's statements should have been admitted based upon his subsequent waivers are unavailing. The argument should have been made before the trial court. It is clear that the Sixth Amendment guarantee of the right to counsel is triggered as of "the initiation of adversary judicial criminal proceedings -whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689 (1972).

To permit the government to execute an end-run around the accused's right to counsel - and his request for such assistance -by hiding behind alleged independent foreign official action, (i.e. precluding his lawyer from seeing him while allowing U.S. agents unfettered access) makes a mockery of that "second layer of prophylaxis for the *Miranda* right to counsel", *McNeil v. Wisconsin,* 501 U.S. 171, 176 (1991), that is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights..." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

2. **Defense counsel disregarded Petitioner's right to complain that United States' officials denied Salazar his right to Due Process under the United States Constitution by failing to provide the assistance of counsel.**

Defense counsel ignored the argument that the failure of United States authorities to timely provide Salazar with the assistance of counsel violated his right to due process of law guaranteed by the Fifth Amendment. His liberty was restricted by United States officials once he was placed in their constructive custody. A well-settled tenet of the body of criminal law is that "[the assistance of counsel] is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty. ... The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides are lost, justice will not still be done." *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938); *see also Powell v. Alabama*, 287 U.S. 45, 68 (1932) ("the right to the aid of counsel is of this fundamental character."). Here, United States officials, through their Colombian counterparts, constructively denied Salazar meaningful access to justice when the Sixth Amendment right to counsel attached. U.S. officials asked Salazar to waive counsel while his lawyer was trying to see him, telling him in Spanish on the waiver form that "[h]owever, because you are not under our custody and we are not in the United States, *we cannot ensure that you will be permitted access to counsel* ... before or during our interview." *Notification of Extraterritorial Rights* at ¶ 6 (emphasis added). On both May 23 and 26, 2005, Salazar had a vested liberty interest in having an attorney present during

subsequent questioning and, as a result, the United States denied Salazar due process by failing to grant him the constitutional protection of the right to counsel. See *Maine v. Moulton,* 474 U.S. 159, 170 (1985) (Supreme Court has "recognized that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."); *see also Moran v. Burbine*, 475 U.S. 412, 428-29 (1986).

In the instant case, there can be no dispute that Salazar had a protected liberty interest at stake the moment he was put into United States custody on May 23-26, 2005 for the purposes of interrogation and prosecution under United States laws. When "[t]he United States is prosecuting a foreign national in a court established under Article III, ...all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990).

Plainly, Salazar was faced with a lengthy and grave punishment upon his imminent prosecution in the United States. Accordingly, the United States officials should have alerted Colombian officials of his right to access counsel. Justice Sutherland illustrated the value of the right to the aid of counsel in *Powell v. Alabama* when he opined:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law... Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.

*Powell,* 287 U.S. at 68-69.

Salazar was sentenced to a prison term of 30 years, presumably a sentence close to his life expectancy. The Sixth Amendment right to counsel applies when a defendant is in foreign custody, and the United States is actively involved in his or her detention and questioning. The U.S. agents should have inquired into Salazar's claim to counsel evidenced by his counsel's

presence at the jail, his execution of the *"poder,"* and a complete cessation of questioning should have resulted. Defense counsel asked nothing of the court or the government.

> **3. Defense counsel disregarded Petitioner's rights under the Self-Incrimination Clause, the Due Process Clause of the Fifth Amendment and the Counsel Clause of the Sixth Amendment by his failure to inquire into United States' involvement in precluding Petitioner's timely access to Colombian counsel which now necessitates hearing on the facts.**

With substantial factual support, Salazar claims that prior to his interview by United States officials on May 26, 2005, his Colombian lawyer sought to provide him counsel. He did so before his client was presented to and examined by United States officials. The Colombian officials then working together with the United States agents knew of the request and delayed counsel's entrance until after the "confession" was extracted. United States counsel Herrmann was told what occurred and did nothing about it except to demand that his client plead guilty. Partly in response, Herrmann was discharged. Defense counsel, who was well aware of the Colombian law enforcement subservient role to the leading United States investigative and prosecuting efforts, disregarded Petitioner's right to challenge the admission of the incriminating statements extracted in violation of the Fifth and Sixth Amendments.

The purpose of *Miranda* is to deter United States law enforcement personnel from taking involuntary statements that are the result of unduly coercive custodial circumstances, which is what occurred here. The United States cannot help to create those circumstances and then exploit them to obtain a confession. United States law enforcement agents are responsible for the acts of their partners. The reverse silver platter doctrine should not apply.

However, the issue that should have been timely put before the court is multifaceted, as it involves not merely the question of responsibility for foreign partner official acts but also whether Fifth and Sixth amendment constitutional rights must be extended to an alien who is in foreign custody but made fully available to United States agents while unavailable to local criminal defense counsel, and whether the "extraterritorial" waiver of rights was effective.

The district court should have been asked to decide whether the Colombian authorities who arrested, detained, and provided United States agents unfettered access to Salazar but not to defense counsel were acting as agents of the United States when access to counsel was delayed on May 26, 2005 for seven hours (8 a.m. – 3 p.m.), and whether there was a joint investigation or venture between the United States and Colombia. Finally, the court should have been asked to inquire into whether the actions of United States officials, or those taken in cooperation with Colombia, in obtaining Salazar's confession were inherently designed to evade constitutional requirements applicable to American officials.

Thus, because prior counsel was asked to seek suppression and failed to inquire into any of these questions of fact or law pertaining to the Salazar interrogations and the obstruction of his right to timely meet with counsel, a Section 2255 hearing and resolution of these issues is now required.

In order to determine whether constitutional rights apply to such a person under these facts, defense counsel was required to raise the issue with the Court to inquire into the extent to which United States officials were involved in his overseas arrest and interrogation. It is well-established that the protection offered by the Bill of Rights extends to the conduct of federal agents abroad. *Reid v. Covert*, 354 U.S. 1, 6 (1957) (Fifth and Sixth Amendments); *Balzac v. Puerto Rico*, 258 U.S. 298, 312-13 (1922) (due process). Relatedly, these rights are also available to defendants who are the victims of unconstitutional action abroad by federal agents, at least where the government seeks to exploit the fruits of its unlawful conduct in a criminal proceeding against the alien in the United States. It follows that where American officials actively participate in the arrest and interrogation of a defendant, the full panoply of *Miranda* warnings apply. *United States v. Nagelberg*, 434 F.2d 585, 587 n. 1 (2d Cir.), *cert. denied*, 401 U.S. 939 (1971); *see also Pfeifer v. USBOP*, 615 F.2d 873, 877 (9th Cir.), *cert. denied*, 447 U.S. 1908 (1980); *United States v. Hensel*, 509 F. Supp. 1364, 1372 (D. Me. 1981).

It is important to re-emphasize that Justice Kennedy wrote, in his concurring opinion in *United States v. Verdugo-Urquidez, supra,* that, where "[t]he United States is prosecuting a foreign national in a court established under Article III...all of the trial proceedings are governed by the Constitution [and] [a]ll would agree...that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant." 494 U.S. at 278.

The doctrine of American non-responsibility for foreign government action is well-settled. *United States v. Covington,* 783 F.2d 1052, 1056 (9th Cir. 1985) (*Miranda/Edwards* exclusionary rule does not apply to statements obtained by foreign law enforcement officers in violation of foreign law; hearing required to determine whether investigator was acting as a law enforcement officer of the Marshall Islands or of the United States); *United States v. Lira,* 515 F.2d 68, 71 (2d Cir. 1975); *United States v. Welch,* 455 F.2d 211, 212 (2d Cir. 1972) (*Miranda* rule not intended to deter foreign police); *see also United States v. Trenary,* 473 F.2d 680 (9th Cir. 1971) ("foreign police officer" exception to *Miranda*); 7).

However, two limited circumstances exist where constitutional requirements attach, and evidence obtained in a foreign jurisdiction may be excluded. Only one applies here: where "cooperation with foreign law enforcement officials may implicate constitutional restrictions," evidence obtained through foreign officials may be excluded. *United States v. Maturo,* 982 F.2d 57, 61 (2d Cir. 1992).

> ### 4. Defense counsel disregarded Petitioner's right to challenge the Colombian and United States officials' participation in Salazar's jailing, withholding access to counsel, and obtaining his confession including the argument that Colombia's participation was so substantial that the action constituted a "joint venture."

To begin, defense counsel failed to inquire as to whether Colombian authorities who jailed and prevented Salazar from having ready access to counsel acted as agents of the United States, or alternatively, whether United States officials were involved in counsel's delay and whether there was a joint investigation or venture between the United States and Colombia.

The Second Circuit in *Maturo, supra*, plainly stated that in certain circumstances, cooperation with foreign law enforcement officials may implicate constitutional protections.

Specifically, constitutional requirements may apply where "the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials." *Maturo*, 982 F. 2d at 61. The Second Circuit has neither adopted a test under the "joint venture" doctrine nor has it expressed an unwillingness to do so. *Maturo*, 982 F.2d at 61-62 (Fourth Amendment context); *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984), *cert. denied* 469 U.S. 1217 (1985); *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied sub nom. Logarusic v. United States*, 464 U.S. 840 (1983) (Fifth Amendment context); *United States v. Busic*, 592 F.2d 13, 23 n. 7 (2d Cir. 1978) (Fourth Amendment context); *United States v. Molina-Chacon*, 627 F. Supp. 1253 (E.D.N.Y. 1986) (Fourth Amendment context). In fact, the failure of the Second Circuit to adopt the "joint venture" theory may rest solely upon the inadequacy of the facts of the cases presented to it. *Maturo*, 982 F.2d at 62 ("Even were we to adopt this doctrine, the record readily reveals that the level of cooperation between the DEA and the TNP falls short of the level needed to find the existence of a joint venture.").

This case compels the conclusion that Salazar's Colombian captors and jailers acted as agents of United States law enforcement officials. First, Petitioner respectfully requests this court take judicial notice of "Plan Colombia." Second, Petitioner respectfully requests this court consider the participation of the "STI-SIU Unit." Third, the Petitioner respectfully requests this court take judicial notice of the intended exhibits, DEA cables describing the confession and its timing. Fourth, Petitioner respectfully requests the court take judicial notice of the Extraterritorial Rights Form which displays a disregard of a United States criminal defendant's opportunity to obtain counsel predicated upon an *open-door policy* to US agents and a delayed or closed door policy applicable to defense counsel. Fifth, the Petitioner incorporates by reference his affidavit, which addresses his "*poder*" request for counsel. It is constitutionally condemnable when the

Colombian authorities provide unfettered jail access to the U.S. agents while delaying access to defense counsel. This issue should have been timely raised.

Accordingly, the Petitioner's counsel disregarded the opportunity to ask the court to view the facts of the case in accordance with *Peterson v. United States*, 812 F.2d 486, 490 (9th Cir. 1987), a Ninth Circuit case which cites a "joint venture" test. *See also, People v. Barona*, 56 F.3d 1087, 1090 (9th Cir. 1995); *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969) (Fourth Amendment); *Pfeifer v. USBOP*, 615 F.2d 873, 877 (9th Cir.), *cert. denied*, 447 U.S. 1908 (1980) (no joint venture where a DEA agent was present and armed while defendant was interrogated by foreign authorities).

Specifically, the court, in *Peterson*, stated that a defendant's constitutional rights attach only when "United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials." *Peterson*, 812 F.2d at 490. *See also, United States v. Coleman,* 25 M.J. 679, 686 (ACMR 1987) (court should "closely analyze any cooperative activity to distinguish the actions of United States officials from those of foreign officials, and apply our norms and law to any and all United States action."). This Court should have been asked to timely review the question of whether Salazar's confession was the product of a "joint venture" with the United States that required it to "scrutinize the attendant facts." *Barona,* 56 F.3d at 1090.

Alternatively, constitutional requirements attach to foreign state action if United States personnel "conducted, instigated, or participated in" the foreign action. *Coleman,* 26 M.J. at 685. In *Coleman,* the court endeavored to "closely analyze any cooperative activity to distinguish the actions of United States officials from those of foreign officials, and apply our norms and law to any and all United States action." 26 M.J. at 686 (*citing Covington, supra.*).

The Colombian arrest was requested by the United States and effectuated by a clearly defined "joint venture" between U.S. and Colombian agents working in unison as planned.

### 5. The *Bin Laden* line of cases provide appropriate guidance suggesting suppression should have resulted.

Salazar was arrested through a joint venture (or operation) of U.S. sponsored agents from Colombia dedicated to the United States and specially trained by the United States. For his words to be used against him, given a timely filed suppression request, the prosecution had to show those admissions were preceded by a proper advice of rights, followed by a valid waiver. Because the waiver obtained by U.S. agents failed to observe the *Miranda* safeguards, Petitioner's statements should have been suppressed. Because counsel was refused timely access, Petitioner statements should have been suppressed. Only by doing so would there be both protection of the right against self-incrimination from government violation as well as deterrence of future police misconduct. *See Bin Laden*, 132 F. Supp. 2d at 187. Here, Salazar was denied the opportunity to receive advice of counsel before U.S. agents initiated their interrogations aimed at obtaining his "confession." The "guiding hand of counsel" was essential to advise Salazar of his rights. See *Powell v. Alabama*, 287 U.S. 45, 69 (1932); *Massiah v. United States*, 377 U.S. 201, 204 (1964) (interrogation is "stage when legal aid and advice were most critical to petitioner.").

On the particular issue of extraterritorial waivers, *Bin Laden*, 132 F. Supp. 2d at 185-192, provides analysis of the waiver form signed by Salazar while in foreign custody. The district court in *Bin Laden* painstakingly analyzed the "advice of rights" ("AOR") form used by federal agents operating overseas. The court reached the conclusion that the AOR was flawed with respect to crucial advice concerning the right to counsel. The court concluded that the improper advice of the right to counsel given under the wording of the AOR form required suppression of an interrogation conducted by U.S. agents abroad. *Id*. at 189-192. Similarly, the specific language of the AOR notification signed by Salazar reflects improper advice as to the right to counsel in agency or "joint venture" cases.

*Bin Laden* finds within the extraterritorial context, a "principled but *realistic application of Miranda's familiar warning/waiver framework*, in the absence of a constitutionally adequate alternative, is both necessary and appropriate under the Fifth Amendment. Only by doing so can [trial] courts meaningfully safeguard from governmental incursion the privilege against self-incrimination afforded to all criminal defendants in this country - wherever in the world they might initially be apprehended...." *See Bin Laden*, 132 F.Supp.2d at 185-186 (emphasis and brackets added).

The *Bin Laden* decision finds it is "far more likely" that a custodial interrogation "carried out beyond our borders and under the aegis of a foreign stationhouse", *id*. at 186, would "present greater threats of compulsion since all that happens to the accused cannot be controlled by the Americans." *Id*. In this case, Salazar was held *incommunicado* for a prolonged number of hours after his formal arrest May 23, 2005 in Cali, Colombia and transportation to Bogotá, Colombia. The accused was "isolated and without assistance for a duration not seen today in America." *Id*. It was actually during the period of *incommunicado* custody that U.S. agents obtained his first signature on the *Notification of Extraterritorial Rights*. Salazar's subsequent detention constituted "[s]ubstandard detention conditions" contributing to a coercive atmosphere. Thus, "strong countervailing forces" had already "run head first into the free will of the accused." *Id*. At a minimum, hearing should have been timely sought on these issues.

Colombian Special Unit "joint venture" partners worked in unison with U.S. agents in the investigation and apprehension of the defendant. The foreign agents were present at arrest, transporting to Bogota from Cali and, according to the cables, while statements were taken. *See Bin Laden* at 187 (*citing United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied*, 464 U.S. 840 (1983), *abrogated on other grounds* (U.S. personnel, despite asking no questions directly, used the foreign officials as their interrogational agents in order to circumvent the requirements of *Miranda*)); *United States v. Molina-Chacon*, 627 F. Supp. 1253, 1262 (E.D.N.Y.1986), *aff'd sub. nom. United States v. DiTommaso*, 817 F.2d 201 (2d Cir.1987)).

The existence of the legal exception for "joint ventures," like the one in this case, is based on a salutary requirement that U.S. constitutional safeguards must apply to any aspect of an overseas interrogation conducted by U.S. agents. Under these unique circumstances, it is essential to impose the requirement that U.S. agents remain vigilant of their foreign partners' conduct rather than later claim ignorance of their partners' denial of basic rights. This includes the Petitioner's right to have ready access to counsel before interrogations, implicating crucial Fifth and Sixth Amendment rights that were violated in this case.

Indeed, the decision in *Bin Laden* was careful to "leave open whether th[e] assumption [that foreign law on access to counsel trumps American procedure] remains valid if foreign authorities cede to U.S. law enforcement primary control of the foreign-based investigation.... ***The relationship in such a hypothetical scenario will have shifted from mutual cooperation to one of agency***." *Bin Laden*, 132 F.Supp.2d at 188-89, n.18 (emphasis added).

Salazar submits that the facts of his case squarely present the "agency" issue addressed in *Bin Laden*. Therefore, the actions of the foreign partners must be imputed to the U.S. agents. Heightened scrutiny must be applied in the "agency" scenario. *Bin Laden's* cautionary words apply. *Id*. at 188 ("To the maximum extent reasonably possible, efforts must be made to replicate what rights would be present if the interrogation were being conducted in America."). Because the foreign partners held Salazar *incommunicado* on the date of his arrest and then compounded their error by obstructing access to his counsel before the May 26, 2005 interrogation, while permitting United States DEA agents to interview him with the presence of his Colombian jailers, suppression of all statements is required. The issues addressed here should have been raised. If timely raised, suppression would have resulted.

**POINT II**  **Under Governing Law, Petitioner is Actually and Factually Innocent of the Count III Money Laundering Charges.**

**A.**  **Background facts.**

Count III charged money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) with the specified unlawful activity being felony drug offenses.

The government presented no trial evidence to allow a determination whether the money was proceeds, profits, mere receipts, or otherwise. Moreover, the jury was erroneously charged concerning the constituent elements of "proceeds" and "concealment" given now governing Supreme Court and Second Circuit law. Consequently, the conviction cannot be sustained and should be vacated.

**B.**  **There has been a sea change in the law since conviction.**

*Cuellar v. United States*, 128 S. Ct. 1994 (2008), held that the money laundering statute could not be satisfied by proving that defendant merely hid funds during transportation, even if substantial efforts had been expended to conceal the money. *United States v. Santos*, 128 S. Ct. 2020 (2008), held that: (1) money-laundering statute's term "proceeds" was ambiguous, thus making rule of lenity applicable, and (2) "proceeds" referred to "profits," not "receipts," in instant prosecution involving stand-alone illegal gambling operation.

Under those particular holdings, Petitioner is factually innocent of the charges and the evidence cannot sustain a finding of guilt.

There are two exceptions to the general rule set forth by the Supreme Court in *Teague v. Lane,* 489 U.S. 288 (1989), that new rules recognized by the Supreme Court "should not be applied retroactively to criminal cases on collateral review." *Teague,* 489 U.S. at 303. The first exception is applicable to the instant case: it holds that where the new rule is considered to be "substantive," it applies retroactively to cases on collateral review. See *Schriro v. Summerlin,* 542 U.S. 348, 351 (2004).

New substantive rules include decisions "that narrow the scope of a criminal statute by interpreting its terms ... as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Id.* at 351-52 (internal citations omitted). Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id.* at 352 (internal quotations omitted). Petitioner makes that claim. The Second Circuit has broadly construed *Santos* and *Cuellar.* [6] *See United States v. Garcia*, 587 F.3d 509, 519 (2d Cir. 2009); [7] *United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009). [8]

---

[6] *Cuellar,* decided by an unanimous Court, held that a conviction under one variety of transportation money laundering, 18 U.S.C. § 1956(a)(2)(B)(i), requires proof that a purpose or design of transporting the involved funds (*i.e.,* the proceeds of a specified unlawful activity) across an international border was to conceal or disguise the nature, location, source, ownership, or control of the funds. *Cuellar,* 128 S. Ct. at 2005. That is, it is not enough for the government to simply show that the funds were transported in a secretive or clandestine manner: a conviction under this sub-variety of money laundering "requires proof that the purpose-not merely [the] effect-of the transportation was to conceal or disguise a listed attribute." *Id.*

[7] *Garcia* holds: "Accepting the use of cash to effect the transaction, coupled with knowledge that the cash would not be declared as income, as a sufficient factual basis for the plea would essentially turn every clandestine transaction involving unlawful proceeds into money laundering. *Cuellar* plainly makes such a result untenable. *Cuellar,* 128 S. Ct. at 2004 (rejecting construction that would make money laundering statute applicable "whenever a person transported illicit funds in a secretive manner"). At bottom, the purpose of the transaction here, as in *Cuellar,* was to pay for narcotics. As a result of the past shipments, the CI owed the drug suppliers money, and Garcia's job was to retrieve this money and deliver it across the country for a fee. While this transaction was effected covertly in an effort to conceal the transaction from the authorities, there is no indication from the record that the transaction itself was an effort to conceal anything about the money. That is insufficient under *Cuellar,* for it evinces only how the money was moved, and does not speak to why it was moved. *See Cuellar,* 128 S. Ct. at 2005; *Ness,* 565 F.3d at 78. As the facts on the record at the time of the plea proceeding fail to satisfy the concealment element of the crime charged, Garcia's plea of guilty to the transaction money laundering conspiracy lacks a sufficient factual basis and was error." *Garcia,* 587 F.3d at 519.

[8] In *Ness,* the government introduced testimony by (1) the defendant's business partner that the defendant stated that he "sells confidentiality," and (2) testimony from an ecstasy trafficker who had delivered drug money to defendant's company because "he didn't want a paper trail saying anything about the money that [he] dropped off." *Id.* at 78. The Second Circuit found that although the evidence showed "how" defendant moved the money, it failed to establish "why" he moved it. *Id.* The testimonial evidence, in conjunction with evidence of defendant's "avoidance

Here, both *Santos* and *Cuellar* are new substantive rules because they narrow the scope of the federal money laundering statute. There is no bar to present Section 2255 review when the Supreme Court decides a new substantive rule of criminal law as opposed to a new procedural rule. And a new rule is substantive, as here, when it interprets the meaning of a criminal statute enacted by Congress so that the conduct for which a defendant was convicted may no longer be illegal.

At the time of the trial, to prove that Salazar engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government merely had to establish that: (1) Salazar conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) Salazar knew the proceeds were from some form of illegal activity; and (4) Salazar knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. Felony drug offenses qualify as a "specified unlawful activity" as that term is used in § 1956. *See* 18 U.S.C. §§ 1956(c)(7)(B)(i) & (A), 1961(1). The government had to prove that Salazar, with the requisite knowledge and intent, conducted a financial transaction involving the proceeds of felony drug offenses. The government did not have to prove, however, that the proceeds were profits. However, given the earlier law, neither the trial nor appellate court recognized the requirement to distinguish profits from proceeds. Accordingly, the proof of illegal drug activity did not extend to any of the essential constituent elements of the money laundering charges on which he was convicted. However, the statutory interpretation of "proceeds" was wrongly and more broadly described in 2007 than in 2008. Hence, retroactive review through Section 2255 is appropriate.

---

of a paper trail, hiding of the proceeds in packages of jewelry, and use of code words[,] show only that he concealed the proceeds in order to transport them." *Id.* Accordingly, the government's evidence was not sufficient to support a finding beyond a reasonable doubt that the defendant's purpose in transporting the narcotics proceeds was to conceal one or more of their attributes. *Id.*

**C.**  **<u>Review of the jury instructions in light of *Santos/Cuellar/Ness/Garcia*</u>**
     **<u>reflects affirmative misstatements of law, insufficiency of proof, and</u>**
     **<u>required additional elements that were not established</u>.**

In order to comply with the law according to *Santos*, the jury instructions would have to include language akin to the following: "To prove a money laundering offense, the Government must prove that the property involved in the financial transaction was the proceeds of a specified unlawful activity. That means that the property represents the profits of the underlying crime, not just its gross revenue. To determine whether the property represents profits, you must rely upon your own findings of fact based upon the evidence presented at trial."

The jury instruction in this case focused upon five elements, two of which now constitute misstatements of the law in light of *Cuellar* and *Santos*. Specifically, the jury was charged concerning a now discredited definition of "proceeds" as well as a now discredited understanding of what it means to "conceal." TR 496-97. Specifically, the Court defined "proceeds" as "any property or money that is derived from or traceable to or obtained as a result of some other money property or activity." TR 499. Similarly, instructions on the "fourth element" of money laundering, i.e. concealment, TR 500-01, were simply erroneous under the new standards set by the Supreme Court and Second Circuit. The Court's instruction permitted a finding of guilt by simply transporting the money, whether by car or otherwise "or the avoidance of a paper trail or anything else that was done with an apparent purpose to keep something secret, to keep the transport secret, you may find this element satisfied." TR 500-01.

The question before the United States Supreme Court in *Santos* was whether the term "proceeds" in the federal money laundering statute, 18 U.S.C. § 1956(a)(1), means the "gross receipts" of the specified unlawful activity engaged in by the defendant, or the "profits" of such unlawful activity. *United States v. Santos*, 128 S. Ct. 2020 (2008). The jury instruction in this case made no such distinction. Santos had been convicted of operating an illegal gambling business, as well as one count of conspiracy to launder money and two counts of money laundering. *Santos,* 128 S. Ct. at 2023. The illegal gambling operation was the "specified

unlawful activity" that gave rise to the money laundering charges against Santos. However, the transactions on which Santos' money laundering conviction was based involved his payments to those who helped him run his illegal lottery, as well as payments to the winners. *Id.* In other words, the payment of his expenses for his illegal lottery formed the basis of his money laundering conviction. There is no evidence that this differs in kind or fact from the facts presented at Salazar's trial.

According to the trial evidence, the purported transportation of cash in this case went from Mexico to Colombia or prospectively from New York or California to Colombia. There is absolutely no record concerning the methods of concealment beyond what may be presumed to be simply cash transportation "from Point A to Point B."

Though charged here as a violation of Section 1956 (a)(1)(B), in *Cuellar,* the Supreme Court reversed a money laundering conviction under Section 1956(a)(2)(B)(I), where the defendant transported approximately $81,000 in cash in a hidden compartment in his vehicle from Texas toward Mexico, because the government only introduced evidence that the defendant physically hid the money during its transportation-not that he intended to conceal the nature, location, source, ownership or control of the proceeds of specified unlawful activity. The Supreme Court held that the "designed ... to conceal" element of money laundering under Section 1956(a)(2)(B)(i) required proof that the transaction was "designed in whole or in part to conceal or guise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity." *Id.* at 2002-03. It found that a conviction under Section 1956(a)(2) required that "the purpose-not merely effect-of the transportation was to conceal or disguise a listed attribute." *Id.* at 2005. The Supreme Court reversed the defendant's conviction because "merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money." *Id.* The Court noted that *"how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 2005 (emphasis in original).

However, merely moving the money was sufficient for Salazar's conviction under the then valid jury instructions tendered at his trial.

Moreover, because an essential underlying element of the statutory offense is "profits" and the Government did not prove "profits," to be distinguished from proceeds, were laundered, and because the jury was misadvised as to "concealment," Petitioner is actually innocent of the money laundering charge of which he stands convicted and is entitled to *vacatur* of that conviction in light of the Supreme Court and Second Circuit decisions.

**POINT III**   **Petitioner Received Ineffective Assistance of Counsel Based on Trial Counsel's Failure to Request Theory of Defense Instructions Concerning "Withdrawal."**

### A. Factual predicate for jury instruction.

A grand jury sitting in the Southern District of New York charged Petitioner in a Third Superseding Indictment of conspiring with others to violate the United States drug laws "[f]rom at least in or about 2002 *up to and including on or about July 26, 2005*." *See* Indictment (Case No. S3-05-Cr.-517), Count One, at p.1, ¶1 (emphasis added). "It was a part and an object of said conspiracy" that Petitioner and his unnamed coconspirators "would and did import into the United States from a place outside thereof a controlled substance, to wit, five kilograms and more of mixtures and substances containing a detectable amount of cocaine." *Id.* at pp.1-2, ¶2. "It was further a part and an object of said conspiracy that [the Petitioner and unnamed others] would and did distribute... five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending that such substance would be unlawfully imported into the United States" in alleged violation of 21 U.S.C. § 963. See Indictment at pp.1-3, ¶¶ 2-4(a-d).

The final "overt act" alleged that "[o]n or about *July 21, 2005*, in Panama City, Panama, at the direction of [Petitioner], co-conspirators not named as defendants herein concealed and stored approximately 1,555 kilograms of cocaine destined for Mexico *en route* to the United States." *See* Count One, at p.3, ¶4(d) (emphasis added); *see also* Count Two, at pp.3-4, ¶5

("[f]rom at least in or about April 2005 *up to and including in or about July 2005*, in Panama, [Petitioner] distributed... five kilograms and more of mixtures and substances containing a detectable amount of cocaine, and aided and abetted such distribution, knowing and intending that the substance would be unlawfully imported into the United States....") (in alleged violation of 21 U.S.C. §§ 959(a) and (c), 960(a)(3) & 960(b)(1)(B)(ii) and 18 U.S.C. § 2). The first two counts of the indictment clearly charged his participation until *July 2005, post-dating his arrest of May 23, 2005.*

Petitioner was arrested on May 23, 2005, as a result of a warrant and awaited extradition to face charges filed in the United States. The indictment on its face contained allegations implicating him in an importation conspiracy that continued *after his arrest.* *See, e.g.,* Indictment at p.1, ¶1 ("[*u*]*p to and including on or about July 26, 2005*."). Therefore, the first sentence of the indictment should have alerted defense counsel that Petitioner was clearly entitled to a "conspiracy withdrawal" instruction as a matter of law.

"A conspirator who presents evidence of his imprisonment during the course of the conspiracy is entitled to a jury instruction on withdrawal." *United States v. Salameh*, 152 F.3d 88, 150 (2d Cir.1998). Therefore, trial counsel rendered ineffective assistance because she failed to request a "theory of defense" instruction that was supported by evidence that Petitioner was continuously detained in Colombia from May 23, 2005 until his later extradition to the United States. Indeed, Petitioner has remained continuously imprisoned from his arrest date up to the present.

The incarceration of Salazar commencing on May 23, 2005 and his questioning by United States federal agents on May 23 and 26, 2005, is evidence from which the jurors could have reasonably inferred that Petitioner withdrew from the conspiracy. The Petitioner's own statements, as recorded by informant Guzman, reflects that his participation in the conspiracy was completed once the drugs reached Panama.

Under these facts, Petitioner was entitled to a jury instruction on withdrawal as a matter of law. See *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir.1976) ("[E]vidence that [defendant] had been incarcerated ... would have been enough to make his withdrawal a jury issue."). A defendant "is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be." *Salameh*, 152 F.3d at 150 *(quoting United States v. LaMorte*, 950 F.2d 80, 84 (2d Cir.1991)). Petitioner contends that whether or not his imprisonment constituted a withdrawal from the charged conspiracy should have been "decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence." *Panebianco*, 543 F.2d at 454, n. 5.

## B.    Petitioner was prejudiced by trial counsel's failure to request the jury instruction.

To prevail on the issue the Petitioner must demonstrate that: (1) counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms," and (2) the alleged insufficiency resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

Petitioner was prejudiced because there is a reasonable probability that a properly instructed jury would have found that he withdrew from the conspiracy when he became incapacitated through incarceration as of May 23, 2005. It is also reasonable to suggest that his communication of notice of his withdrawal after speaking to no less than three United States federal agents may have precipitated his son's subsequent murder. See *United States v. United States Gypsum Co.*, 438 U.S. 422, 464-65 (1978) ("Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach coconspirators have generally been regarded as sufficient to establish withdrawal or abandonment.") (collecting authorities).

The Second Circuit notes in *United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964), that the unlikelihood of other conspirators relying for further aid on an individual "known to be confined for the very offense in which they were engaging makes such confinement a sufficient affirmative act to sustain the defense of withdrawal in the absence of countervailing evidence." *Id.* at 390.

Petitioner should be granted a new trial as to Counts One and Two of the indictment at which time the jury should be instructed on the defense theory of withdrawal. That right to a fair theory of defense jury instruction was forfeited during the first trial as a result of the ineffectiveness of counsel in violation of the Sixth Amendment to the United States Constitution.

By: _____

NEIL M. SCHUSTER, (*pro hac vice application pending*) (Attorney for Petitioner Manuel F. Salazar-Espinosa)
Florida Bar No. 216909
555 N.E. 15th Street, Suite 2C
Miami, FL 33132
(305) 416-0324
Fax: (305) 416-0325

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by mail this _____ day of January, 2011 to **Iris Lan, AUSA,** Office of the U.S. Attorney, One St. Andrew's Plaza, New York , NY 10007.

By:_____
Neil M. Schuster